UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/29/2023
```

| | |
|---|---|
| VERONA REID,<br><br>        Plaintiff,<br><br>   -against-<br><br>THE TANDYM GROUP, LLC, et al.<br><br>        Defendants. | **22-CV-469 (PGG) (BCM)**<br><br>**OPINION AND ORDER** |

JOHNINE SUMPTER,

        Plaintiff,

   -against-

NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION d/b/a
NYC HEALTH + HOSPITALS, et al.

        Defendants.

CONSOLIDATED CASES

**BARBARA MOSES, United States Magistrate Judge.**

Before the Court are three motions, made jointly by two defendants, to compel four plaintiffs to arbitrate their wage and hour claims, originally asserted in two now-consolidated actions: *Reid v. The Tandym Group, LLC, et al.*, 22-cv-469-PGG-BCM (hereafter *Reid*), and *Sumpter v. New York City Health and Hosp. Corp.*, 22-cv-8176-PGG-BCM (hereafter *Sumpter*).[1] Additionally, defendants seek a ruling from this Court that plaintiffs must arbitrate under the Commercial Arbitration Rules of the American Arbitration Association (the AAA), and must proceed individually in arbitration, rather than on behalf of any class or collective.

---

[1] Defendant The Tandym Group, LLC (Tandym) was formerly named The Execu|Search Group, LLC (Execu|Search), and was initially sued under that name. *See The Execu|Search Group is Now Tandym Group*, PR NEWSWIRE, https://www.prnewswire.com/news-releases/the-execusearch-group-is-now-tandym-group-301575876.html (all websites last visited September 29, 2023). For clarity, this defendant it is referred to as "Tandym" throughout this Opinion and Order.

For the reasons that follow, the motions to compel arbitration will be granted, this action will be stayed pending the outcome of the arbitration, and the Court will require plaintiff Andrea George to arbitrate individually rather than on a representative basis. However, the arbitrator, not this Court, must determine which AAA rules will govern the arbitration, and whether plaintiffs Verona Reid, Johnine Sumpter, and Yvonne Yeung may pursue class or collective claims in that forum.

## I.    BACKGROUND

Reid, Sumpter, Yeung, and George all are nurse practitioners who signed Locum Tenens Practitioner Services Agreements (the Services Agreements) with Tandym, a staffing agency. In total, the four plaintiffs executed six Services Agreements: Reid and George each signed one agreement, while Sumpter and Yeung each signed two. *See* Reid Agmnt. (Dkt. 23-1); Sumpter 5/11/2020 Agmnt. (Dkt. 51-1 in *Sumpter*); Sumpter 1/4/2022 Agmnt. (Dkt. 34-1 in *Sumpter*); George Agmnt. (Dkt. 51-2 in *Sumpter*); Yeung 5/25/2020 Agmnt. (Dkt. 51-3 in *Sumpter*); Yeung 8/13/2020 Agmnt. (Dkt. 51-4 in *Sumpter*).[2] Pursuant to their Services Agreements, all four plaintiffs worked in New York City public hospitals, operated by defendant New York City Health and Hospitals Corporation (H+H), during the COVID-19 pandemic. *See* Reid Compl. (Dkt. 1) ¶¶ 32-33; Sumpter Compl. (Dkt 1 in *Sumpter*) ¶¶ 29-30.[3]

---

[2] The Services Agreements signed by Reid, Sumpter and Yeung are all identical. However, as discussed in more detail in Parts I.C.2 and III.D, *infra*, the Services Agreement signed by George contains updated language, including an updated arbitration clause.

[3] All record citations in this Opinion and Order are to the docket in *Reid* unless otherwise specified. The *Sumpter* action was closed after the cases were consolidated (*see* Dkt. 72 at 2), and all post-consolidation filings are docketed only in *Reid*.

A.     *Reid* Action

On January 19, 2022, plaintiff Reid filed a complaint against Tandym and H+H, alleging that both defendants were her employer, but that they misclassified her as an independent contractor, and thus that their failure to pay her overtime wages at one and one-half times her regular hourly wage, and to provide a time-of-hire wage notice and proper wage statements, violated the Fair Labor Standards Act (FLSA) and the New York Labor Law (NYLL). Reid Compl. ¶¶ 6, 11, 26-27, 45-53, 71, 108-24. On March 31, 2022, defendants filed a motion to compel arbitration, arguing that "Ms. Reid's relationship with [Tandym] was governed by the terms of [her] Services Agreement," in which she "agreed to resolve 'any dispute, controversy or claim arising out of or related to th[e Services] Agreement or in connection with a breach thereof' through 'final and binding arbitration' conducted 'pursuant to the Federal Arbitration Act,' under the commercial arbitration rules of the American Arbitration Association[.]" Reid Mem. (Dkt. 22) at 1-2 (quoting Reid Agmnt. ¶ 17).[4]

Although H+H is a non-signatory to Reid's Services Agreement, defendants invoke the estoppel principals set out in *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004), to argue that Reid must also arbitrate her claims against H+H, because (i) they are "identical to her claims against [Tandym]," presenting "factual issues that are 'intertwined' with the terms of her relationship with [Tandym]," and (ii) Tandym and H+H share a "close relationship," such that Reid may not refuse to arbitrate against H+H after agreeing to arbitrate against Tandym. Reid Mem. at 11-13. Defendants also request that this Court "confirm" that the AAA Commercial Arbitration Rules will govern the arbitration, *id*. at 13-14, and order Reid to arbitrate her claims

---

[4] In their motion papers, the parties refer only to arbitration. I note, however, that all of the Services Agreements contain language requiring the parties to first "attempt to resolve [disputes] by mediation" before proceeding to arbitration, if necessary. *E.g.*, Reid Agmnt. ¶ 17(a).

"on an individual basis," rather than on a collective or class basis, "because nothing in the Services Agreement references or authorizes collective or class arbitration." *Id.* at 14-16.

In response, Reid concedes that "this dispute must be resolved pursuant to the alternative dispute resolution provisions of the Services Agreement" as against both defendants. Reid Opp. (Dkt. 30) at 2. However, she argues that the arbitrator – not this Court – must determine whether she can pursue her claims as a class or collective action, because the parties delegated that question to the arbitrator when they "expressly incorporated" the AAA Commercial Arbitration Rules, which state, among other things, that the arbitrator shall have the power to "rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." *Id.* at 4 (quoting *AAA Commercial Arbitration Rules and Mediation Procedures*, R-7(a), https://adr.org/sites/default/files/Commercial-Rules_Web.pdf). Plaintiff adds that the AAA's Commercial Arbitration Rules, as they existed in 2020, made the AAA's Employment Arbitration Rules applicable to disputes involving "work or work-related claims," and therefore concludes that the Employment Arbitration Rules (which also empower the arbitrator to rule on "her or her own jurisdiction") will ultimately apply to her claims. *Id.* at 6-7. However, Reid does not ask the Court to determine which AAA rules will apply. To the contrary: that question, she says, is for the arbitrator. *Id.* at 7.

In reply, defendants reiterate that Reid's Services Agreement "does not mention – let alone authorize – class or collective arbitration," and argue that this Court "can and should decide the issue[.]" Reid Reply (Dkt. 31) at 4, 5 (citation omitted). Additionally, although defendants do not deny that Reid's Services Agreement incorporates the AAA's Commercial Arbitration Rules (or that those rules assign questions of arbitrability to the arbitrator), they argue that since Reid entered into her Services Agreement "on behalf of herself *and her personal operating entity*, Thelwell

Health," there is no basis for her to contend "that the arbitration of her claims should be conducted under the AAA's Employment Rules[.]" *Id.* at 6-7 (all emphases in original unless otherwise indicated).[5] Thus, defendants ask this Court to rule, in advance, that the Commercial Arbitration Rules, not the "more minimalistic" Employment Arbitration Rules, will apply to Reid's claims. *Id.* at 7.

    **B.**    ***Sumpter* Action**

On September 23, 2022 – after the conclusion of briefing in *Reid* – plaintiff Sumpter, represented by the same counsel as Reid, filed a nearly identical complaint alleging the same FLSA and NYLL violations. *See* Sumpter Compl. (Dkt. 1 in *Sumpter*) ¶¶ 5, 68, 105-21. However, Sumpter's complaint names only H+H as a defendant, and makes no mention of Tandym. On November 21, 2022, George and Yeung filed consent forms to join the *Sumpter* action as opt-in plaintiffs. (Dkt. 17 in *Sumpter*.)

On January 23, 2023, Tandym moved to intervene (Dkt. 66 in *Sumpter*), arguing that plaintiffs "owe their relationship with Defendant [H+H] solely to their status as independent contractors of Tandym" and that Tandym, not H+H, assigned plaintiffs to perform services for H+H and paid them for those services. (Dkt. 67 in *Sumpter* at 1, 4-5.) On February 16, 2023, the Hon. Jennifer E. Willis, the then-presiding Magistrate Judge in *Sumpter*, granted Tandym's motion to intervene and consolidated the action with *Reid*. (Dkt. 73 in *Sumpter*.) Thereafter, the *Sumpter* action was reassigned to the Hon. Paul G. Gardephe, United States District Judge, and the

---

[5] Reid's Services Agreement runs between Tandym, as Contractor, and "Verona Reid," as Practitioner, and is signed by Reid individually. *See* Reid Agmnt. at ECF pp. 2, 9. Certain related documents, including a Release and Authorization, a banking form, and a tax form, are signed on behalf of "Thelwell Health Services Inc.," or (somewhat confusingly) identify that entity as the Contractor. *See id.* at ECF pp. 10, 11, 12.

undersigned Magistrate Judge (who were already presiding over *Reid*), and the *Sumpter* docket was closed. (Dkt. 72.)

### C.     Consolidated Action

On March 13, 2023, defendants (that is, original defendant H+H and intervenor-defendant Tandym) moved to compel all three plaintiffs in the former *Sumpter* action to arbitrate their claims. Because George "executed a later, updated Tandym contract" (which the parties sometimes call the "2022 Agreement," distinguishing it from the "2020 Agreement" signed by Reid, Sumpter and Yeung), defendants made two separate motions: one to compel the arbitration of Sumpter's and Yeung's claims, and another to compel the arbitration of George's claims. *See* George Mem. (Dkt. 56) at 2 n.1.

### 1)     Motion to Compel Sumpter and Yeung

As noted above, Sumpter and Yeung signed the same version of the Services Agreement that Reid signed. In support of their motion to compel these two plaintiffs to arbitrate, defendants first argue that the plain language of the contract shows that plaintiffs' claims fall within the scope of its arbitration clause. *See* Sumpter Mem. (Dkt. 58) at 11-2. Defendants emphasize that plaintiffs agreed with Tandym, not H+H, to offer services to Tandym's clients "on an exempt independent contractor basis." *Id.* at 5. H+H played "no role or part in that decision." *Id.* Nor did H+H compensate plaintiffs directly for their services. Instead, Tandym paid Sumpter $522,340.00, and Yeung $575,762.13, "for the services they provided on Tandym's behalf to H+H between May 2020 and January 20, 2023." *Id.* at 4-5. Thus, defendants argue, because plaintiffs "agreed to arbitrate 'any dispute, controversy or claim arising out of or related to th[e Services] Agreement,'" and because their FLSA and NYLL wage and hour claims against H+H all "arise out of the compensation they were paid by Tandym for the work they performed on Tandym's behalf to H+H," and "their treatment as independent contractors," those claims (including their "central

allegation that they were misclassified as independent contractors and denied overtime compensation") are covered by the arbitration provision in the 2020 Agreement. *Id.* at 12.

Relying on the same equitable estoppel principles that they invoked in their initial motion against Reid, defendants next argue that that the fact that H+H is a non-signatory to the relevant Services Agreements does not permit plaintiffs to avoid their arbitration obligation, because their claims against H+H are "inextricably intertwined" with their (unasserted) claims against the signatory, Tandym. Sumpter Mem. at 13. Defendants explain that all of plaintiffs' claims "arise under the 'subject matter' of the underlying [arbitration] agreement," *id.* (alteration in original) (quoting *In re Document Techs. Litig.*, 2017 WL 4350597, at *3 (S.D.N.Y. June 27, 2017)), in that their overtime claims against H+H challenge "what they were paid according to their Agreements" by Tandym, and thus "undeniably involve Tandym's contracting and compensation practices[.]" *Id.* at 13-14. Moreover, there is a "close relationship" between plaintiffs and both defendants, in that "plaintiffs would never have performed services for H+H but for their Agreements with Tandym." *Id.* at 15. Thus, in defendants' view, plaintiffs "should be estopped from refusing to arbitrate their compensation disputes with H+H[.]" *Id.* at 15-16. Lastly, defendants argue – as they did in their initial motion – that this Court, rather than an arbitrator, should "confirm" that plaintiffs must arbitrate under the AAA's Commercial Arbitration Rules, and on an individual basis. *Id.* at 16-19.

In response, Sumpter (writing for herself and Yeung, *see* Sumpter Opp. (Dkt. 62) at 1 n.1) notes that these plaintiffs sued only H+H, not Tandym – alleging that H+H employed them and owes them overtime – and argues that "Tandym's intervention does not create claims against it, nor transform the claims against H+H into claims against H+H and Tandym." *Id.* at 2-3, 6. Thus,

in Sumpter's view, neither Tandym's intervention nor the consolidation of these cases affects the question whether she should be compelled to arbitrate against H+H. *Id*. at 2-7.

That question should be answered in the negative, Sumpter urges, because her original Services Agreement "terminated" after two years (that is, before she opted in to this action), and does not contain any language suggesting that its dispute resolution clause survived that termination. Sumpter Opp. at 10-14. "Even if the arbitration [agreement] had not terminated," according to Sumpter, it would apply "only to claims between Sumpter and Tandym," because only Sumpter and Tandym were "parties" to the Services Agreement, and the arbitration provision is "explicit as to exactly who and what is covered by its terms." Sumpter Opp. at 15.[6]

Sumpter further argues that H+H cannot rely on "intertwined claims estoppel" to compel her to arbitrate with it, because: (i) her "overtime claims against H&H 'arise under' state and federal statute[s][,] not under the 2020 Agreement," Sumpter Opp. at 18; and (ii) Tandym is merely H+H's "vendor," "not a partner, subsidiary, or agent of H&H," and thus the relationship between the signatory (Tandym) and the non-signatory (H+H) is not close enough to invoke estoppel. Sumpter Opp. at 17-21. Lastly, Sumpter "adopts and incorporates" the arguments previously made by Reid regarding "class waiver and what AAA rules and procedures apply." *Id.* at 23.

In reply, defendants reject Sumpter's argument that her arbitration agreement expired, noting that she "signed another two-year Agreement in 2022, before her 2020 Agreement expired." Sumpter Reply (Dkt. 68) at 1.[7] In any event, according to defendants, "the relevant inquiry is not

---

[6] *See, e.g.*, Sumpter 5/11/2020 Agmnt. ¶ 17(a)-(b) (requiring "the Parties" to mediate, and then arbitrate, any dispute "arising out of or related to this Agreement").

[7] *See* Sumpter 1/4/2022 Agmnt. ¶ 2 ("This Agreement shall remain in full force and effect for a period of two (2) years commencing on the date upon which both Parties have fully executed this Agreement as indicated on the signature page hereto unless terminated by either Party[.]"). Yeung, however, signed her second and last Services Agreement on August 13, 2020. *See* Yeung 8/13/2020 Agmnt; Part III.C, *infra*.

on the Agreements' survival clause, but instead solely on whether 'the arbitration clause' *itself* 'expressly provide[s] for any time limitations,'" which, in defendants' view, is a question for the arbitrator. *Id.* at 2-3 (citations omitted). Defendants then reiterate their estoppel argument, noting that courts applying New York law have "applied the doctrine to vendor-vendee relationships similar to those at issue here." *Id.* at 6. Lastly, defendants again request that the Court order plaintiffs to proceed individually in arbitration, under the AAA's Commercial Arbitration Rules. *Id.* at 8-10.

### 2)       Motion to Compel George

Defendants' motion to compel George to arbitrate her claims against H+H follows the same general logic as their motion concerning Sumpter and Yeung, but takes advantage of the expanded language of 2022 Agreement signed by George, which requires arbitration of:

> any dispute, controversy, or claim arising out of or related to this Agreement or any breach or termination of this Agreement, including but not limited to the Services, and any alleged violation of any federal, state, or local statute, regulation, common law, or public policy, whether sounding in contract, tort, or statute *by either Party hereto or by Tandym's Client*[.]

George Agmnt. ¶ 11(b) (emphasis added). George's contract, unlike those of the other plaintiffs, also states expressly that the arbitration "shall take place on an individual basis – *i.e.*, class and collective arbitration is expressly prohibited under this Agreement"; that each party will "only submit their own individual claims"; and that the arbitrator will have "no jurisdiction or authority to compel or oversee any class or collective claim." *Id.* ¶¶ 11(d), 11(f).[8] Additionally, under George's contract:

> The arbitrator, not any court, shall have exclusive authority to resolve any dispute relating to the enforceability or formation of this Agreement and the arbitrability of any dispute between the Parties, *except for any dispute relating to the enforceability*

---

[8] In what is fairly clearly a scrivener's error, the contract also states that "*Tandym* expressly waives any ability to maintain or join any class action against *Tandym or Tandym's Clients* in any forum." George Agmnt. ¶ 11(f) (emphasis added).

> *or the scope of the class and collection action waiver, which shall be determined by a court of competent jurisdiction*.

George Agmnt. ¶ 11(f) (emphasis added).

In their moving brief, defendants first point out that the language in ¶ 11(b) "clearly cover[s] [George's] various wage and hour claims." George Mem. at 11. Next, defendants argue that "George must also arbitrate her claims against H+H, even though H+H is not a signatory to her Agreement with Tandym," *id.* at 12, because those claims are "intertwined in the relationship between her, Tandym, and H+H itself," *id*. at 14, *and* because "Tandym and Ms. George agreed not only to arbitrate their disputes, but agreed that '[t]he arbitrator, not any court, shall have exclusive authority to resolve any dispute relating to the enforceability or formation of th[eir] Agreement and the arbitrability of any dispute between' them" (except for disputes relating to the class and collective action waiver). *Id*. at 12 (quoting George Agmnt. ¶ 11(f)). Thus, in defendants' view, "any questions Ms. George may raise about her obligations to arbitrate her claims against H+H alone" are questions for the arbitrator, not the Court. *Id*. Lastly, relying on ¶¶ 11(d) and 11(f) of George's Services Agreement, defendants argue that this Court should "compel Ms. George to arbitrate her claims on an individual basis." *Id*. at 16.

In response, George emphasizes (as Sumpter did) that she has never asserted any claims against Tandym, and argues that Tandym's intervention has not created any such claims. *See* George Opp. (Dkt. 61) at 2-7. George then argues that notwithstanding the language of ¶ 11(f) of her contract, the Court, not the arbitrator, must resolve the question whether she agreed to arbitrate with H+H, because the underlying question is one of "contract formation," which is reserved for the court, rather than contract interpretation, which is for the arbitrator. *Id*. at 9-10.

Turning to the merits of that question, George notes that her arbitration agreement is with Tandym, not with H+H, and asserts that notwithstanding the reference to "Tandym's Client" in

¶ 11(b), the plain language of the rest of the arbitration clause "create[s] rights and obligations only for 'the Parties,'" and does not "contemplate[] that either Tandym or George agree to go to arbitration with anyone else." George Opp. at 12. In George's view, the mention of "Tandym's Client" in ¶ 11(b) "doesn't make H&H [a] party to the 2022 Agreement or mean [that] George agreed to arbitrate with H&H." *Id.* at 14. Rather, that reference means only that the "Parties" would be required to arbitrate any claims against each other that "arise from H&H's actions." *Id.*

Next, George disputes that H+H can invoke intertwined claims estoppel to force her to arbitrate against it, arguing that her FLSA and NYLL claims do not "arise under" her Services Agreement because the *Sumpter* complaint "does not reference the 2022 Agreement," and the resolution of her claims "does not depend on any term in the 2022 Agreement." George Opp. at 16. She further argues that H+H lacks a sufficiently close relationship with either Tandym or herself to satisfy to second prong of the estoppel test, because Tandym is merely "H&H's vendor." *Id.* at 17.

Lastly, in the event that "the Court finds [she] has agreed to arbitrate with H&H," George "adopts and incorporates those arguments made by Reid regarding class waiver and what AAA rules and procedures apply." George Opp. at 24. If her claims are sent to arbitration, but other plaintiffs' claims remain in litigation, George requests that no stay be imposed. *Id.* at 25.[9]

In reply, defendants argue that George's claims do, in fact, "clearly arise from the subject matter of her [Services] Agreement" because the subject of that contract, like the subject of her

---

[9] Displaying more creativity than common sense, George also argues that the explicit waiver of class or collective proceedings in ¶ 11(f) of the 2020 Agreement is unenforceable because "Tandym breached it by joining this action" as an intervenor-defendant. George Opp. at 19. As noted above, however, the language on which George relies for this argument contains a fairly clear scrivener's error. The parties could not have intended to bar "Tandym" from joining "any class action against Tandym."

claims against H+H, is "her services and compensation," including whether she is owed additional overtime compensation. George Reply (Dkt. 67) at 2-3. They also argue that under New York law, "vendor-vendee relationships" can be sufficiently close to trigger the application of intertwined claims estoppel. *Id.* at 4. Defendants add that it was objectively "predictable" that George would become affiliated with H+H in such a way as to make it unfair not to arbitrate her claims against it, noting that she "entered into her Agreement with Tandym for the sole purpose of providing services to Tandym's clients, including H+H," that she agreed "to look solely to Tandym for compensation for the services [she] provided," and that she further agreed "to look to arbitration – not litigation – to resolve any claims she might raise" for wage and hour violations by Tandym "or by Tandym's Client." *Id.* at 4-5 (quoting George Agmnt. ¶ 11(b)). Lastly, defendants reiterate their positions that George must "proceed individually" in arbitration, *id.* at 6-8, under the AAA's Commercial Arbitration Rules (rather than its Employment Arbitration Rules). *Id.* at 9.

On June 29, 2023, the Court held oral argument on all three motions to compel arbitration. (Dkt. 75.)

## II.   LEGAL STANDARDS

### A.   Arbitration under the Federal Arbitration Act

The Federal Arbitration Act (FAA) establishes that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable[.]" 9 U.S.C. § 2. Any party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may seek an order from the district court directing that "arbitration proceed in the manner provided for in such agreement." *Id.* § 4. "Allegations related to the question of whether the parties formed a valid arbitration

agreement . . . are evaluated to determine whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

A court presented with a motion to compel arbitration must first establish that an arbitration agreement exists. This determination "is governed by state-law principles of contract formation." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). Here, the parties do not disagree that arbitration agreements exist – only whether they run between plaintiffs and H+H. Nor do they disagree that those agreements must be interpreted under New York law, in accordance with ¶ 27 of the 2020 Agreement and ¶ 11(a) of the 2022 Agreement.

Before a court may rule on the enforceability or scope of an arbitration agreement, it must determine the threshold issue of whether those questions are for the court or the arbitrator to decide. "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Techs.*, *Inc. v. Comms. Workers*, 475 U.S. 643, 649 (1986)); *see also Bell v. Cendant Corp.*, 293 F3d 563, 566 (2d Cir. 2002) (emphasizing that the inquiry whether "there is 'clear and unmistakable' evidence from the arbitration agreement" is to be "construed by the relevant state law"). Although "federal policy generally favors arbitration, the obligation to arbitrate nevertheless remains a creature of contract," *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001), and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs.*, 475 U.S. at 648 (citation omitted); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302

(2010) ("As we have explained, this 'policy' is merely an acknowledgment of the FAA's commitment to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.'") (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

In order to determine whether the parties have "clearly and unmistakably" delegated the question of arbitrability to the arbitrator, the court properly considers, among other things, whether "the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes," *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318–20 (2d Cir. 2021); *see also Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019) ("Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability[.]"), and whether the parties have "explicitly incorporate[d] rules that empower an arbitrator to decide issues of arbitrability." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *see also Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 118, 120-23 (2d Cir. 2003) (arbitration agreement providing for "all disputes" to be referred to arbitration, coupled with incorporation of rules that delegated arbitrability to the arbitrator, constituted clear and unmistakable evidence of intent to arbitrate arbitrability).

Where statutory claims are asserted, "a party can prevent enforcement of the arbitration agreement only by showing that 'Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 227 (1983)); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985) ("[S]o long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."). Here, plaintiffs do not argue that their

FLSA and NYLL claims are not arbitrable, and regardless, "[c]ourts have held that NYLL and FLSA claims are arbitrable and that the legislatures have not expressed or clearly implied an intention to preclude those claims from arbitration." *Salzano v. Lace Ent., Inc.*, 2014 WL 3583195, at *3 (S.D.N.Y. July 18, 2014) (collecting cases).

If the district court determines that all of the parties' claims must be arbitrated, it must stay the action pending the outcome of the arbitration proceedings. *See Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015) (the FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay requested"). "[I]f the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987). To obtain a stay in those circumstances, a party "must first demonstrate that 'there are issues common to the arbitration and the court proceeding,' and then show that 'those issues will be finally determined by arbitration.'" *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 499 (S.D.N.Y. 2013) (Nathan, J.) (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995)). If the movant "can make this initial showing, it then bears the burden of demonstrating: (1) that a stay will not 'hamper the progress of the proceeding,' . . .; (2) that the arbitration 'is expected to conclude within a reasonable time,' []; and (3) that the stay will not impose an 'undue hardship' on the non-moving party." *Id.* (quoting *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991)). Ultimately, "[t]he decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco*, 815 F.2d at 856.

### B.      Equitable Estoppel

Although arbitration is a "creature of contract," and "a party therefore cannot be required to submit to arbitration any dispute which it has not agreed to submit," *Doe v. Trump Corp.*, 6 F.4th 400, 412 (2d Cir. 2021), courts "have recognized a number of common law principles of contract law that may allow non-signatories to enforce an arbitration agreement, including equitable estoppel." *Ross v. Am. Express Co.*, 478 F.3d 96, 99 (2d Cir. 2007). A non-signatory may estop a signatory from refusing arbitrate claims against it where:

> (1) 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed' and (2) there is 'a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute' with the non-signatory.

*Doe v. Trump Corp.*, 453 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (quoting *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010)), *aff'd*, 6 F.4th 400 (2d Cir. 2021); *accord JLM Indus.*, 387 F.3d at 177-78. "'[T]raditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through" estoppel, and thus New York law governs this issue. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). However, "the distinction between federal law and New York law on this issue appears to be insignificant," in that "[t]he Second Circuit has long recognized" a non-signatory's ability to compel arbitration "based on common law principles of contract, including estoppel," and "New York courts have consistently agreed, citing Second Circuit precedent both where a signatory is seeking to compel a non-signatory to arbitrate . . . as well as in the reverse scenario[.]" *Gv't Emps. Ins. Co. v. Grand Med. Supply, Inc.*, 2012 WL 2577577, *3 (E.D.N.Y. July 4, 2012) (collecting cases).

"Claims are intertwined 'where the merits of an issue between the parties [i]s bound up with a contract binding one party and containing an arbitration clause.'" *Denney v. Jenkins & Gilchrist*, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) (alteration in original) (quoting *JLM Indus.*,

387 F.3d at 177). "The plaintiff's *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel." *Birmingham Assocs. Ltd. v. Abbott Lab'ys*, 547 F. Supp. 2d 295, 301 (S.D.N.Y. 2008) (quotation omitted). Thus, while "simple but-for causation" is not "all that is required" to satisfy the first prong, "but-for causation is indicative of common subject matter." *Moss v. BMO Harris Bank, N.A.*, 24 F. Supp. 3d 281, 289 (E.D.N.Y. 2014) (Bianco, J.).

The second part of the equitable estoppel inquiry "looks primarily to the relationship between the non-signatory seeking to compel arbitration and the signatory in whose shoes the non-signatory seeks to stand." *Holzer v. Mondadori*, 2013 WL 1104269, at *14 (S.D.N.Y. Mar. 14, 2013); *see also Medidata Sol. Inc. v. Veeva Sys., Inc.*, 748 F. App'x 363, 366-67 (2d Cir. 2018) (examining whether "*plaintiffs themselves* treated the signatory and non-signatory corporate affiliates as at least somewhat interchangeable with respect to the plaintiffs' rights and responsibilities under the relevant contract"). "The relationship between the parties must either support the conclusion that the signatory effectively consented to extend its agreement to arbitrate to the nonsignatory, 'or, otherwise put, made it inequitable for [the signatory] to refuse to arbitrate on the ground that it had made no agreement with [the non-signatory].'" *Doe v. Trump*, 6 F.4th at 413 (alterations in original) (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008)).

## III.   DISCUSSION

### A.   Reid

Reid concedes that her claims – against both defendants – "must be resolved pursuant to the alternative dispute resolution provisions of [her] Services Agreement[.]" Reid Opp. at 2. As to Reid, therefore, the only remaining issues are whether this Court should determine "what rules must apply in arbitration" and whether Reid must arbitrate "on an individual basis," as defendants

urge, *see* Reid Mem. at 13-14, or whether these are questions for the arbitrator, as Reid contends. *See* Reid Opp. at 4.

Both questions must be left to the arbitrator.

I assume, as did the Court of Appeals in *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392 (2d Cir. 2018), that "the question whether an arbitration clause authorizes class [or collective] arbitration is a so-called 'question of arbitrability' presumptively for a court, rather than an arbitrator, to decide." *Id*. at 394; *see also Borozny v. Raytheon Techs. Corp.*, 2023 WL 334378, at *2 (D. Conn. Jan. 20, 2023) (making same assumption). This presumption, however, is "only the first step" in the Court's inquiry. *Sappington*, 884 F.3d at 395. That is because "the presumption that a court should decide a question of arbitrability is overcome when there exists 'clear and unmistakable' evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by [an] arbitrator." *Id.* (alteration in original) (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198-99 (2d Cir. 1996)).

Reid's Services Agreement contains a broad arbitration clause, requiring the arbitration of "any dispute, controversy or claim arising out of or related to this Agreement" that cannot be resolved by mediation. Reid Agmnt. ¶ 17(b). Moreover, that arbitration clause requires that any demand for arbitration be filed with the AAA "pursuant to the AAA's commercial arbitration rules then in effect," Reid Agmnt. ¶ 17(c), and specifies that the arbitration "be conducted in accordance with the then applicable rules and procedures of the AAA[.]" *Id*. The Services Agreement thus incorporates the AAA Commercial Arbitration Rules, including Rule 7(a), which states:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.

AAA Comm. Arb. R-7(a); *see also* AAA Empl. Arb. R- 6(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.").[10]

Where, as here, "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec*, 398 F.3d at 208 (analyzing an earlier version of Rule 7(a) which was identical save for the clause disclaiming "any need to refer such matters first to a court"); *accord DDK Hotels*, 6 F.4th at 318-19 ("[W]here the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this – coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability – constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator."). New York courts agree that, where parties have agreed to arbitrate under the AAA Commercial Arbitration Rules, issues of arbitrability "are for the arbitration tribunal to determine." *Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*, 888 N.Y.S.2d 458, 459, 66 A.D.3d 495, 496 (1st Dep't 2009), *aff'd*, 14 N.Y.3d 850, 927 N.E.2d 553 (2010); *see also Zachario v. Manios*, 891 N.Y.S.2d 54, 55, 68 A.D.3d 539, 539 (1st Dep't 2009) ("Where there is a broad arbitration clause and the parties' agreement specifically incorporates by reference the American Arbitration Association (AAA) rules providing that the arbitration panel shall have the power to rule on its own jurisdiction, courts will 'leave the question of arbitrability to the

---

[10] Insofar as the record discloses, none of the parties now before the Court has filed an arbitration demand with the AAA. The natural reading of the phrase "then applicable," in ¶ 17(c) of Reid's Services Agreement, points to the AAA rules as they exist when such a demand is filed (not, as Reid apparently presumes, when the Services Agreement was executed, *see* Reid Opp. at 6-7). The Court therefore cites to the relevant AAA rules in their current form.

arbitrators.'") (citation omitted). Consequently, the question whether Reid's Services Agreement authorizes class or collective arbitration is a question for the arbitrator, not this Court.[11]

It is also up to the arbitrator, not this Court, to determine the procedural question whether the arbitration will proceed under the AAA Commercial Arbitration Rules or whether those rules themselves point to the application of some or all of the AAA Employment Arbitration Rules.[12] "[A]n arbitrator presumptively resolves issues of 'contract interpretation and arbitration procedures.'" *Duran v. J. Hass Grp., L.L.C.*, 531 F. App'x 146, 147 (2d Cir. 2013) (summary order) (quoting *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 453 (2003)); see *also* AAA Comm. Arb. R-9 ("The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties."); AAA Empl. Arb. R-48 (same). Thus, this Court has no authority "to determine at the outset what procedural rules are to be applied" in the arbitration. *Bancol Y Cia. S. En C. v. Bancolombia S.A.*, 123 F. Supp. 2d 771, 772 (S.D.N.Y. 2000) (declining to determine whether arbitration "must proceed under the rules of the Inter-American Commercial Arbitration Commission").

---

[11] The contrary cases on which defendants rely – in which the court itself determined that a plaintiff must proceed individually in arbitration – did not consider whether the parties clearly and unmistakably intended to delegate arbitrability issues to the arbitrator. *See, e.g.*, *Lopez v. Lidl US, LLC*, 2023 WL 2674757 (S.D.N.Y. Mar. 29, 2023); *Clookey v. Citibank, N.A.*, 2015 WL 8484514, at *4 (N.D.N.Y. Dec. 9, 2015); *Anwar v. Fairfield Greenwich Ltd.*, 950 F. Supp. 2d 633, 637 (S.D.N.Y. 2013), *Sanders v. Forex Cap. Mkts., LLC*, 2011 WL 5980202, at 10 (S.D.N.Y. Nov. 29 2011). Moreover, in *Clookey*, the arbitration clause expressly stated "that claims may 'be arbitrated only on an individual basis[,]' and "neither [the consumer] nor [Citibank] may pursue a [c]laim as part of a class action. " 2015 WL 8484514, at *4.

[12] Under the current version of the Commercial Arbitration Rules, the AAA will apply "the Employment Fee Schedule" (rather than the Employment Arbitration Rules as a whole) to "any dispute between an individual employee or an independent contractor (working or performing as an individual and not incorporated) and a business or organization [where] the dispute involves work or work-related claims, including any statutory claims and including work-related claims under independent contractor agreements." AAA Comm. Arb. R-1*.

Because Reid's Services Agreement clearly and unmistakably delegates arbitrability issues to the arbitrator, the question whether Reid may pursue class or collective claims in arbitration must be determined by the arbitrator. And because the choice between the AAA Commercial Arbitration Rules and the AAA Employment Arbitration Rules is a quintessentially procedural issue, it too must be determined by the arbitrator.

## B.      Sumpter

No agreement to arbitrate exists between H+H and Sumpter. The 2020 Agreement, which Sumpter signed, does not mention H+H (or any Tandym client) in its arbitration provision. Moreover, the contract contains a "negating clause," stating that the "Agreement is intended to be for the exclusive benefit of the Parties hereto and shall not be construed to create any right or benefit to any other party whatsoever." Sumpter 1/4/2022 Agmnt. ¶ 22. H+H thus lacks standing to enforce the contract as a third-party beneficiary. "Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established: '[w]here a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, . . . that provision is decisive.'" *India.com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005) (quoting *Nepco Forged Prods., Inc. v. Consolidated Edison Co. of N.Y., Inc.*, 470 N.Y.S.2d 680, 681, 99 A.D.2d 508, 508 (2d Dep't 1984)).

Since H+H cannot enforce the arbitration agreement as a party or a third-party beneficiary, it must establish that equitable estoppel (sometimes called "intertwined claims estoppel") applies. This, in turn, requires a showing (i) that the issues H+H seeks to resolve in arbitration are "intertwined" with the Services Agreement, *see Doe v. Trump*, 453 F. Supp. 3d at 640; and (ii) that the relationship between H+H and Tandym ("the signatory in whose shoes the non-signatory seeks to stand," *Holzer*, 2013 WL 1104269, at *14) must be "of a nature that justifies a conclusion" that

Sumpter, having agreed to arbitrate with Tandym, "should be estopped from denying an obligation to arbitrate a similar dispute" with H+H. *Sokol*, 542 F.3d at 359.

The first prong of the test is easily met here. It is clear that Sumpter's claims against H+H arise out of the subject matter of the Services Agreement that she signed with Tandym. Sumpter's claims against H+H are premised on her allegation that she was misclassified as an independent contractor, and on that basis wrongfully deprived of overtime wages, when in fact H+H "exercised control over all aspects of her job," making her a non-exempt employee covered by the FLSA and NYLL. *See Sumpter* Compl. ¶¶ 5, 42, 46. But it was the Services Agreement that placed her at H+H, and it was the Services Agreement that designated her an independent contractor, making her ineligible for overtime premiums. *See* Sumpter 1/4/2022. Agmnt. ¶¶ 3(l), 4(d), 11. Moreover, the Services Agreement states that she must arbitrate "any . . . claim arising out of or relating to this Agreement," *id.* ¶ 17(b), which would certainly include claims (such as those brought by Reid) that her independent contractor designation was improper and that she should have been paid time-and-a-half for overtime.

Sumpter's claims against H+H thus "arise out of" and are "intertwined with" the subject matter of her Services Agreement. *See Ragone v. Atl. Video at Manhattan Ctr.*, 2008 WL 4058480, at *2, 8 (S.D.N.Y. Aug. 29, 2008) (where a makeup artist signed an employment contract containing a broad arbitration agreement with AVI, which then assigned her "to provide make-up services to one of AVI's major clients, ESPN," the artist's hostile work environment and retaliation claims against ESPN "ar[o]se from the 'subject matter' of the Arbitration Agreement between the plaintiff and AVI"), *aff'd,* 595 F.3d 115 (2d Cir. 2010); *Catz v. Precision Glob. Consulting*, 2021 WL 1600097, at *1 (S.D.N.Y. Apr. 23, 2021) (where a lawyer signed an employment agreement, including an arbitration clause, with "workforce management platform" PCG, acting on behalf of

its "Client" Phaidon and "End Client" D2, for whom the lawyer was to perform "consulting services," her employment-related claims (including FLSA claims) against Phaidon and D2 were "inextricably linked" to her PCG employment agreement, satisfying the first prong of the equitable estoppel test); *Lismore v. Societe General Energy Corp.*, 2012 WL 3577833, at *7 (S.D.N.Y. Aug. 17, 2012) (where plaintiff signed an employment contract containing an arbitration clause with SG, which later assigned him to perform work for its subsidiary SG Energy, plaintiff's employment discrimination claims against SG Energy arose out of and related to "Plaintiff's employment with SG," such that "[t]he subject matter of the agreement and the subject matter of this dispute are intertwined"); *see also A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 476 (where plaintiffs' "status" as CSC lessees was central to their antitrust claims against multiple defendants, those antitrust claims arose "directly" from plaintiffs' contract with non-party Neustar – which contained an arbitration clause – because it was through that Neustar contract that plaintiffs originally became CSC lessees).

The fact that Sumpter did not name Tandym as a defendant – and thus has no current claims against it – is irrelevant to the first prong of the intertwining test. *See, e.g., Lismore*, 2012 WL 3577833, at *3 (plaintiff only sued SG Energy, with whom he had no arbitration agreement); *A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 478 (plaintiffs carefully refrained from suing Neustar, with whom they had an arbitration agreement). It is similarly irrelevant that Sumpter's claims against H+H are brought under the FLSA and NYLL, and that her pleading does not mention the Services Agreement. It is the "factual allegations" that she makes, not the legal label under which she makes them, that dictates whether those claims arise out of the subject matter of the Services Agreement. *A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 477. Indeed, the Second Circuit has found claims to be "intertwined" when they did not even "require interpretation of the agreement" containing the

arbitration clause. *Denney*, 412 F. Supp. 2d at 298 (citing *JLM Indus.*, 387 F.3d at 178). It is enough that the claims "depend[] in substantial part on the existence of an agreement that contain[s] an arbitration clause." *Id.* at 298-99 (citation omitted); *see also Birmingham Assocs.*, 547 F. Supp. 2d at 301 (emphasizing that the "sine qua non" is "[t]he plaintiff's *actual dependence* on the underlying contract").

The remaining question for the Court, as to Sumpter, is whether the relationship between Tandym and H+H was such that it would be "unfair for [Sumpter] to claim that [her] agreement to arbitrate ran only to [Tandym] and not to [H+H]." *Sokol*, 542 F.3d at 361. I answer that question in the affirmative.

As the Second Circuit noted in *JLM Indus.*, it has "had no occasion to specify the minimum quantum of 'intertwined-ness' required to support a finding of estoppel," only that "this estoppel inquiry is fact-specific." *JLM Indus.*, 387 F.3d at 178. In many cases in which estoppel is applied, "the non-signatory party asserting estoppel has had some sort of *corporate* relationship to the signatory party." *Ross*, 547 F.3d at 144; *see*, *e.g.*, *Lismore*, 2012 WL 3577833, at *8 (noting that the signatory, SG, controlled its non-signatory subsidiary, SG Energy).

That factor is not present here. However, courts have also "extended estoppel beyond situations involving affiliated corporate entities," such as where the non-signatory defendant is "explicitly named" in a contract containing an arbitration clause "as having certain tasks to perform under that contract," *Ross*, 547 F.3d at 145; *see also A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 479 (non-signatory defendants had "active roles" laid out in the arbitration agreement, which "vested" them with various "rights and responsibilities" although they did not sign it). Equitable estoppel has also been applied where the plaintiff was hired or contracted by a signatory party to perform services for non-signatory parties. *See Ragone*, 595 F.3d at 128 (plaintiff "knew from the

24

date of her employment . . . that she would work with and be supervised by ESPN personnel in the ordinary course of her daily duties"); *Catz*, 2021 WL 1600097, at *11 (where signatory defendant PGC, and non-signatory defendants Phaidon and D2, "maintained a business relationship whereby PGC employed individuals that Phaidon had recruited for jobs with D2," plaintiff "could reasonably have seen that invocation of the arbitration provision [by PGC] would extend to Phaidon and D2"). Estoppel is particularly appropriate where plaintiff's claimed injuries resulted from the "concerted actions" of both the signatory and the non-signatory. *Ragone*, 595 F.3d at 119.

In this case, although H+H was not "explicitly named" in the Services Agreement, *Ross*, 547 F.3d at 144, the contract specified that plaintiff would be assigned to a Tandym "Client," and that, although her paycheck would come from Tandym, it would be based upon the work she performed for the Client, at the Client's facility, in accordance with "Client policies, procedures, by-laws, and standards." Sumpter 1/4/2022 Agmnt. ¶¶ 1, 3(c).[13] Thus, as in *Ragone*, plaintiff knew from the moment she signed the Services Agreement "that she would work with and be supervised by [H+H] personnel in the ordinary course of her daily duties." 595 F.3d at 128; *see also Catz*, 2021 WL 1600097, at *2 (Catz knew that her nominal employer PGC was a "platform that employs workers on its clients' behalf," and understood that "PGC's end client, D2 would be the main entity receiving Catz's professional services"). Moreover, like plaintiff Ragone (who alleged that she "understood ESPN to be, to a considerable extent, her co-employer," 595 F.3d at 127 (2d Cir.

---

[13] The contract gave the Client other responsibilities as well, including communicating – to Tandym – all necessary information concerning, among other things, the length of plaintiff's assignment and the scope of her work. *See* Sumpter 1/4/2022 Agmnt. ¶ 5. Thus, the non-signatory had "certain tasks to perform under that contract," *Ross*, 547 F.3d at 145, and was vested with an "active role" in the relationship among the parties. *A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 479. On this record, plaintiff "cannot," and does not, "claim that [she was] unaware that by signing onto the [Services] Agreement [she was] entering into a relationship with [H+H], whereby disputes between them and related to the content and substance of the [Services] Agreement could be subject to arbitration through the [Service] Agreement's arbitration provision." *Id*. at 480.

2010)), plaintiff Sumpter expressly alleges, in this action, that H+H was her employer, *see Sumpter* Compl. ¶ 10, and as such controlled "the days and hours she worked," the "rate she [was] paid," the "hours and locations" she worked, and the "tools and equipment she use[d]." *Id*. ¶¶ 46-50.

This case is similar to *Ragone* in another way as well: plaintiff's claims of unlawful conduct "rely on the concerted actions of both defendants." 595 F.3d at 119. To be sure, the conduct alleged is quite different. Ragone claimed that she was sexually harassed by ESPN employees, and that the harassing conduct was "condoned by her supervisors at both Atlantic Video and ESPN," who reacted to her complaints with "indifference and/or hostility" and ultimately terminated her employment, *Ragone*, 2008 WL 4058480, at *9, whereas Sumpter complains that she was misclassified as an independent contractor when in fact she was an employee entitled to (among other things) time-and-a-half for her overtime hours under the FLSA and the NYLL. *Sumpter* Compl. ¶¶ 105-15. In both cases, however, the injuries were brought about by the "concerted actions" of the signatory and the non-signatory, *Ragone*, 2008 WL 4058480, at *10, who together arranged for plaintiff to provide her services to H+H on a straight-time basis as "staffed medical industry personnel." *Sumpter* Compl. ¶ 16.[14]

I recognize that the arbitration provisions of Sumpter's Services Agreement (unlike the later version signed by George) are "focused on claims asserted by one of the parties to that agreement," *Colony Cap. Inc. v. Flaherty*, 2022 WL 2440993, at *7 (S.D.N.Y. July 5, 2022), and therefore that the language of those provisions did not serve to alert Sumpter to the possibility that she could be required to arbitrate a dispute with – or a claim concerning alleged misconduct by –

---

[14] Although Sumpter made a strategic choice to file a second action, omitting Tandym as a defendant, she has not disavowed (and is hardly in a position to contradict) her co-plaintiff Reid's allegations that all of the similarly-situated nurse practitioners were employees of *both* defendants, who *jointly* misclassified them and failed to pay them lawful overtime wages. *See* Sumpter Compl. ¶¶ 6, 11, 32, 44, 45, 49, 53, 59, 60, 68-74.

a non-signatory such as H+H. The application of intertwined claims estoppel, however, does not require that the arbitration clause itself mandate arbitration with the non-signatory. The question is whether it would be inequitable, under all of the circumstances, "for [the signatory] to refuse to arbitrate on the ground that it had made no agreement with [the non-signatory]." *Doe v. Trump*, 6 F.4th at 413 (alterations in original) (quoting *Sokol Holdings,* 542 F.3d at 361). Moreover, in *Colony Cap.*, the party seeking arbitration (Flaherty) not only had no arbitration agreement with Colony (the party against whom he sought to arbitrate); Flaherty and Colony were parties to a separate limited partnership agreement in which they expressly agreed to "litigate rather than arbitrate" claims arising out of that agreement – including the indemnification claim that Flaherty sought to arbitrate. 2022 WL 2440993, at *8. On those facts, the court held that Colony could not be deemed to have consented to arbitrate with Flaherty. *Id.*

No such factors are present here. I therefore conclude that, as to Sumpter, both prongs of the equitable estoppel test are satisfied. Having agreed to arbitrate with Tandym, Sumpter is estopped from refusing to arbitrate with H+H, and will be compelled to do so.

### C.    **Yeung**

Plaintiff Yeung is identically situated to plaintiff Sumpter in all respects save one. Yeung signed her second and last Services Agreement on August 13, 2020, more than two years before she opted in to the *Sumpter* action. By its terms, that agreement was to "remain in full force and effect for a period of two (2) years" from the date of its execution, except that provisions "which by their terms impose obligations beyond the expiration or termination of this Agreement shall survive such expiration or termination." Yeung 8/13/2020 Agmnt. ¶ 2.

The parties draw sharply different conclusions from these facts. Sumpter (on behalf of Yeung) contends that any obligation that Yeung had to arbitrate with H+H expired along with her

27

last Services Agreement, such that as to Yeung, defendants cannot meet their *prima facie* burden of showing "the existence of a valid arbitration agreement." Sumpter Opp. at 9-10; *see also Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) ("[A] party seeking to invoke FAA § 4 must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'"). It is well-settled that questions concerning the "existence of an arbitration agreement must be resolved by the courts in the first instance." *Olin Holdings Ltd. v. State*, 73 F.4th 92, 101 (2d Cir. 2023)

Defendants disagree on both points. In their view, "issues surrounding the retroactivity of arbitration provisions, and the survival provisions following an agreement's termination, are for an arbitrator to resolve." Sumpter Reply at 3. In any event, defendants assert, the relevant contract interpretation question is "whether 'the arbitration clause' itself 'expressly provide[s] for any time limitations,'" *id*. at 2 (alteration in original) (quoting *Salzano*, 2014 WL 3583195, at *4). Since Yeung's arbitration clause contains "no such limitations," it continues to apply to her claim. *Id*.

This Court will not reach the question whether Yeung's arbitration clause expired before she opted in to this action, because defendants are correct that this is an issue for the arbitrator. As the Court of Appeals explained in *Abram Landau Real Estate v. Bevona*, 123 F.3d 69 (2d Cir. 1997), the question "whether an arbitration agreement has expired or been terminated" is "different" from the question "whether the parties ever entered into an arbitration agreement at all." *Id.* at 72-73. Where, as here, the parties present the former question, but disagree over who should decide it:

> the dispositive question is whether the parties have agreed that an arbitrator should decide that question. Where the agreement contains a sweeping arbitration clause covering all disputes involving the meaning of terms and provisions of the agreement and where the arbitration clause does not expressly exclude disputes over the termination provision or the "evergreen" clause, disputes over these matters should be submitted to arbitration.

*Id.* at 73 (citations omitted)*; see also CPR (USA) Inc. v. Spray*, 187 F.3d 245, 256 (2d Cir. 1999) (confirming applicability of *Abram Landau* test after *Litton Fin. Printing v. NLRB*, 501 U.S. 190 (1991)); *Citi Connect, LLC v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 2020 WL 5940143, at *5 (S.D.N.Y. Oct. 7, 2020) (where arbitration provision is "sufficiently sweeping," and "does not expressly exclude from the broad ambit of arbitrability disputes over either the termination of the agreement or the continuation of the agreement pursuant to its 'evergreen' clause," the parties' dispute over "(1) whether the CBA was terminated; and (2) if it was, whether the arbitration agreement survived the termination of the CBA," must be "submitted to arbitration"); *75-07 Food Corp. v. Trustees of United Food & Com. Workers Loc. 342 Health Care Fund*, 2014 WL 691653, at *11 (E.D.N.Y. Feb. 24, 2014) ("*Abram Landau* held that the issue of *whether an agreement expired or not* is arbitrable to the extent the agreement contains a broad arbitration clause").

The arbitration clause in Yeung's second Services Agreement is "sufficiently sweeping," *Citi Connect*, 2020 WL 5940143, at *5, in that it extends to "any dispute, controversy, or claim arising out of or related to this Agreement." Yeung 8/13/2020 Agmnt. ¶ 17(b). And nothing in that Services Agreement "expressly excludes" disputes over the termination of its arbitration clause from the "broad ambit of arbitrability." *Citi Connect*, 2020 WL 5940143, at *5. I therefore express no view on the termination question itself, but conclude that it must be submitted to the arbitrator.

**D.   George**

As noted above, when George signed her Services Agreement on September 8, 2022 (less than two weeks before she opted in to the *Sumpter* action), she signed an updated version of the document. In George's contract, the arbitration clause is even broader, expressly extending to claims that arise out of or relate to the Services Agreement, and are brought "by either Party hereto

or Tandym's Client." George Agmnt. ¶ 11(b). Moreover, there is no negating clause in George's contract.

In plaintiffs' view, these updates change nothing, because "[m]erely mentioning Tandym's Clients doesn't make H&H [a] party to the [George] Agreement." George Opp. at 14. But H+H need not be a party to the contract in order to enforce its arbitration clause against George. As discussed above, H+H may estop George from refusing to arbitrate with it by showing (i) that the issues H+H seeks to resolve in arbitration are "intertwined" with her Services Agreement, *see Doe v. Trump*, 453 F. Supp. 3d at 640; and (ii) that the relationship between H+H and Tandym ("the signatory in whose shoes the non-signatory seeks to stand," *Holzer*, 2013 WL 1104269, at *14) is "of a nature that justifies a conclusion" that George, having agreed to arbitrate with Tandym, "should be estopped from denying an obligation to arbitrate a similar dispute" with H+H. *Sokol*, 542 F.3d at 359.

Defendants have met the first prong of the test as to George for the same reasons discussed in Part III.B, *supra*, regarding Sumpter. They have met the second prong of the test for those reasons as well – and for the additional reason that H+H is now "'linked textually' to the arbitration provisions" in George's agreement. *Moss*, 24 F. Supp. 3d at 291 (concluding that "estoppel is appropriate" where arbitration agreement extended to claims against non-signatory "agents and servicers" of signatory lender, and where it was "foreseeable that defendants would be included among the lenders' agents and servicers"); *see also Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 407 (2d Cir. 2001) (remanding for entry of an order compelling Choctaw to arbitrate with non-signatory where "the controversy presented on this appeal is linked textually to the Construction Contract, and its merits are bound up with the dispute now being arbitrated between Choctaw and Bechtel"); *A2P SMS Antitrust Litig.,* 972 F. Supp. 2d at 479 (compelling

arbitration where "[t]he RS Agreement does not specifically mention WMC, but does refer to 'agents' of CTIA and anticipates that their role will be precisely the one that WMC in fact played").

When George signed her Services Agreement, she expressly agreed to arbitrate claims "by either Party hereto or by Tandym's Client[.]" George Amnt. ¶ 11(b). That Client was H+H. I therefore conclude that "that the signatory [George] effectively consented to extend [her] agreement to arbitrate to the nonsignatory [H+H]," and in any event that it would be "inequitable for [her] to refuse to arbitrate on the ground that [she] had made no agreement with [H+H].'" *Doe v. Trump*, 6 F.4th at 413. Consequently, George will be required to arbitrate her claims against H+H.

George will also be required to limit her arbitration claims to those brought on her own behalf. The 2022 Agreement, unlike the earlier version signed by plaintiffs Reid, Sumpter, and Yeung, contains a clear and express class arbitration waiver, stating that the arbitration "shall take place on an individual basis – *i.e.*, class and collective arbitration is expressly prohibited under this Agreement." George Agmnt. ¶ 11(d). Perhaps for avoidance of doubt, the point is then repeated:

> Except for representative claims which cannot be waived under applicable law and which are therefore excluded from this Agreement, the Parties waive the right to assert, participate in, or receive money or any other relief from any class or collective claim against each other in court, arbitration, or any other proceeding. Each party shall only submit their own individual claims against the other and will not seek to represent the interests of any other person.

*Id*. ¶ 11(f). Moreover, "the arbitrator shall have no jurisdiction or authority to compel or oversee any class or collective claim." *Id*. Finally, while the 2022 Agreement grants the arbitrator the "exclusive authority to resolve any dispute relating to the enforceability or formation of this Agreement and the arbitrability of any dispute between the Parties," *id*., it carves out an exception for "any dispute relating to the enforceability or the scope of the class and collection action waiver, which shall be determined by a court of competent jurisdiction." *Id*.

Under New York law, the class and collective action waiver is enforceable. *See West v. LaserShip, Inc.*, 2023 WL 1972216, at *2 (S.D.N.Y. Feb. 13, 2023) ("New York courts routinely uphold contractual proscriptions against class actions," and "also uphold class and collective action waivers when applying . . . New York law in FLSA and NYLL actions") (collecting cases); *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 251 n.28 (S.D.N.Y. 2020) ("New York courts . . . have upheld class action waivers in arbitration agreements against challenges they are unconscionable."). George does not contend otherwise, arguing instead that Tandym breached the Services Agreement by "joining" Sumpter's putative class action as a defendant. George Opp. at 19-20. Aside from the fact that the parties could not have intended to prohibit Tandym from joining "any class action against Tandym," George's argument fails because (i) Tandym intervened to *oppose* plaintiffs' efforts to pursue class or collective claims, not to join any class or collective; and (ii) as plaintiff points out, she herself is "only bringing claims against H+H," George Opp. at 1, which has not done anything to violate the Services Agreement and consequently cannot have waived its right to compel arbitration on an equitable estoppel theory.

Ordinarily, given the breadth of the arbitration clause in the George Agreement, coupled with the parties' "clear and unmistakable" intention to empower the arbitrator to decide issues of arbitrability, *Contec*, 398 F.3d at 208, the question whether to enforce the class and collective waiver against George – as against the other plaintiffs – would be delegated to the arbitrator. The George Agreement, however, evidences an equally "clear and unmistakable" intention to withhold the arbitrator's power to resolve "dispute[s] relating to the enforceability or the scope of the class and collection action waiver," and instead to submit that narrow question for determination by the Court. George Agmnt. ¶ 11(f). As to George, therefore, it is the ruling of the Court that she must arbitrate her claims against H+H on an "individual basis." *Id*. ¶ 11(d).

The more general question of which AAA rules will govern George's arbitration does not come within the carve-out, and therefore will be deferred for decision by the arbitrator.

## IV.   STAY PENDING ARBITRATION

The Court having determined that all of the plaintiffs' claims must be arbitrated, and the defendants having requested a stay, this action will be stayed pending the outcome of the arbitration proceedings. *Cellco P'ship*, 794 F.3d at 343.

## V.   CONCLUSION

For the foregoing reasons, and to the extent specified above, defendants' motions to compel arbitration are GRANTED and this action is STAYED. The parties are directed to file joint status updates concerning the progress of the arbitration on February 1, 2024, and every three months thereafter. The Clerk of Court is respectfully directed to terminate the motions at Dkts. 21, 55, and 57.

Dated: New York, New York
      September 29, 2023            **SO ORDERED**.

**BARBARA MOSES**
**United States Magistrate Judge**